The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Be seated, please. All right, the next case is Davis v. Western Carolina University, and Mr. Korsen, we'll hear from you first. Yes, Your Honor, may it please the Court, John Korsen with the Wake Forest Law School Appellate Clinic. And under Local Rule 46A, it's my pleasure to introduce the two third-year law students who will be appearing today on behalf of Mr. Davis, the appellant. First, Nicole Scallon, who will have the opening argument, and next, Christina Banfield, who will handle the rebuttal. Thank you very much. I'm sure they've worked hard on this. We'll hear from them. Thank you, Your Honors. All right, Ms. Scallon. May it please the Court. Summary judgment in this case should be overturned for three reasons. First, the district court overlooked genuine disputes of material fact. Second, the district court relied on defendants' post hoc justifications for its adverse employment action. And third, in doing both of these things, the district court made credibility determinations in favor of defendants. In ruling on a motion for summary judgment, the judge's function is not to weigh the evidence and determine the truth of the matters asserted, but is to determine whether there is a genuine issue for trial. The district court overlooked two significant areas of facts in this case. The first is that it ignored evidence proffered by Davis that the adverse employment action was based on impermissible disability criteria. This can be shown through the Faculty Hearing Committee hearing in this case. When you make that argument, are you recognizing the distinction between a disability and conduct that may have resulted from the disability, which we are still able to assess independently? Yes, Your Honor. Part of the significant fact of this conduct argument will come into play with the post hoc justifications Western asserted in its brief and at the district court stage in summary judgment. Well, I'm just thinking, you know, you go through the incidents. You start with the incident where he's parking the automobile and they have to report him because he gets in such a spat. He gets a neighbor involved in some kind of action with respect to shooting the dog that made him, made the neighbor do something the neighbor never intended to do, and then gets involved in these either postured or real suicidal circumstances and sending people e-mails and they call the police and he runs off away. All of these things have prompted his colleagues, and these are all fairly undisputed facts, have prompted his colleagues to say they're very troubled to be around him. Many try to avoid him and there's no question he's apparently a very good teacher and is a good academic and does a good job there, but in terms of being part of the community and being able to work and carry on the mission of the university, these facts look like they support the suggestion that he's disruptive. Yes, Your Honor, and I'm going to... Are those facts disputed? Yes, Your Honor, and I'm going to address your question in two different points. First, the district court ignored evidence that Davis was in fact collegial. He was able to present significant evidence from other faculty members and other colleagues that he was an esteemed colleague who brightened the lives of those around him, that he made an effort to go out of his way to assist his colleagues if they ever needed help with anything. But that doesn't negative the incidents that happen repeatedly and on a continuing basis. But it does show that there is... It doesn't negative the affidavits of his faculty members. I don't know how many there were, a collection of them, where they said, one person said, I come to the parking lot and see if his car is there to try to avoid him, and other people, a friend says, I have a hard time being around him. And anyway, I understand that he has positive traits. I mean, there's just no question about it. It looks like he was an energetic, creative teacher and did a good job in his teaching. And he also did good things to other people. We have evidence of that. So, but we have to address the conduct that caused the administration and other faculty members to conclude that he was disruptive. Yes, Your Honor, but what is significant in this case is that those incidents of conduct were not cited as the reasons for the discriminatory action until after the discriminatory or the adverse employment action was taken. And as this Court has held in Warch v. Ohio Insurance Casualty Company, when evidence lacks probative value as to the decision-maker's reasoning at the time of the decision, it should not be considered by a court when deciding whether a plaintiff has demonstrated that a reasonable jury could find discriminatory animus on the part of that decision-maker. And the two essential decision-makers in this case specifically testified that the three, three reasons that they considered when making their decision to deny tenure and later termination was the two suicide attempts and the mental health deterioration in the fall of 2010 when he was diagnosed with HIV. And that can be, she, Provost Taekman Lott specifically testified, and this testimony can be found on pages 617 through 621, that she only considered those three instances of conduct. She further testified. What was their conduct in the fall of 2010? He was diagnosed with it. I know, but what was the conduct they considered? A few of his colleagues reported to his department head that they were concerned for his well-being. And at that point, when he came back from California for his treatment for his HIV-related illness, he met with the ERT team where they again determined that he was no threat to workplace violence or safety. And the three, the two decision-makers in this case have testified on numerous occasions that the only three incidents that weighed on their decision to deny tenure and promotion were the two suicide attempts and the fall of 2010 HIV treatment. The list of 15 items that defendant has identified in their brief and that the district court relied on were not identified in this case until the defendant's second supplemental set of interrogatory answers. From the moment that Davis's promotion and tenure were denied, he immediately asked Western to provide him with the list of the disruptive conduct that they were citing as its reason for the denial of tenure and promotion, and that was refused. When he then went to the faculty hearing committee to appeal the decision for the denial of tenure and promotion, which both sides got to present their case, Western had physical evidence and witnesses, so did Davis. And at that case, Western, again, only cited the two suicide attempts and the conduct in the fall of 2010 when he was treated. Were they real suicide attempts, or were they postured? They were real suicide attempts. This is a genuine dispute of fact, which is this report. It doesn't matter. I don't think it's a material dispute of fact. The question is, I mean, for instance, one of them, it appeared like it was an overdose suicide attempt and it looked like he sort of was in that circumstance. Somebody comes and said, we're going to call the police. And all of a sudden, he jumps out of the car and starts running and drives his motorcycle home. I mean, that doesn't sound like a genuine suicide attempt. It sounds like something's going on there. But what's important is the decision-maker's perception of what this is, and Western clearly believed that this was related to mental health disabilities. It may be, but it's conduct. That's my whole point from the beginning, and that's what I'm interested in doing, is separating the conduct from nobody gave as a reason the man has mental health or he says one time he's bipolar and the next time he's not and these types of things. The fact is the disruption to the community was what they were troubled by. And were these faculty members who responded and supplied affidavits fearing his presence, were they, I mean, one of them was a friend of his. Yes, Your Honor, but the defense counsel could have also asserted the direct threat defense, which they have not done in this case. They have not asserted that Davis presented a direct threat to workplace violence and safety. They didn't have to have a direct threat. They relied basically on the disruption to the community, the lack of collegiality, the idea that how can you have a university carry out its mission if you have faculty divided among themselves and this type of thing. However, it's essential to focus on the fact that the three instances that they relied on in this decision were the two suicide attempts and the 2010 deterioration of the fall. At the very beginning of your argument, you said that one of the decision makers' decision, which was found, according to you, on J617 to 621, just said that these. Can you give me some light? Can you tell me exactly where this is, what you rely on? Yes. It appears on pages. I know you said it was 617 to 621, and I wanted actually what the language of it. She says, according to you, there are only these three things, and they were all, and I've been browsing through it and I didn't see her saying, I only relied on three things and these were the three things. On pages, it varies through this whole. She first mentions that she considered the 2009 suicide attempt to be disruptive. She then stated that. Where are you reading from? This is on page 619, Your Honor. What is it? 619, Your Honor. I don't have her specific exact wording, but she refers to the 2009 suicide attempt as the disruptive conduct she considered. Well, the question was, was an example of the obstructive conduct in the fall of 2009 where he took a number of pills in his office. Yes, that was one of the incidents. So I thought that your submission to us was there were only three things. And in that, in her testimony, she talks about the 2009 suicide attempt, the 2011 suicide attempt, and the fall of 2010 disruption when he went to California. She's asked, are those some of the incidents? Yes. And then she didn't identify any others when she was asked if there were. And then she was also asked. Those are the three that I recall. Do you ever cite his mental health issues as reasons? I think in his administrative reconsideration meeting, in my notes, it seems like there's reference, he makes reference to that. I don't know what that means. She's referencing that when she met with Davis after the denial of tenure and promotion, that they discussed his mental health disabilities, and that's what these suicide attempts in the fall of 2010 conduct related to. She also stated on page 621 that she made a deduction that plaintiff had mental health disabilities because having such emotional crisis as this, she would have to have mental health issues, thereby acknowledging that she believed that these three instances of conduct were related to his mental health disabilities. But then she separated the mental health disabilities from the conduct when she said, whatever his issues are, the way it manifested itself in terms of campus and colleagues, that's what weighs into my decision. Then the next question was, so it's the behavior that was the concern for you, not the reasons for the behavior. Her answer, correct. So it sounds like she focused on the conduct there, not the mental health being the cause of the conduct. Yes, Your Honor. And I understand that that's what she testified to, but they've also acknowledged through the administrative body, through Western's own appeal process in this, they found that the decision to deny tenure and terminate was based on discriminatory animus, and that the two suicide attempts and the conduct in the fall of 2010 should have never been contained in his record of teaching, service, and scholarship. I'm sorry, when the they is... The faculty hearing committee, which is... Their decision isn't final on these things, correct? No, Your Honor, but it shows that there is a genuine dispute of fact that a jury could find that... No, I don't think it does show that necessarily. It shows that there was a difference of opinion within people in the university about whether this would be a cause for fire or not giving tenure, firing him. And the problem I think you have is it might, if this was in an employment, straight up employment situation, create a genuine issue of material fact. But we have a fair amount of law talking about deferring to decisions of university people, not getting in the middle of what's going on. Yes, Your Honor, but if it can be inferred from the evidence presented that that decision was based with discriminatory animus, the court can look behind what the decision-making process was of the university. But then doesn't your suggestion have to be that behavior that comes from a disability that you can't fire for that reason? It has to be so egregious in nature, whereas the cases that are cited, what the district court relied on when it discussed misconduct, was a Jones v. American postal union case. But can you just answer my question directly? In other words, is it your position that, because I think you do have in this record an acknowledgment that behavior caused by disability was the reason that this person was fired. So is that your position, that if you have behavior that comes because of some disability, some mental health problems, that you can't fire someone? No, that is not my position. I think the conduct has to be so egregious in nature. Why so egregious? What does that mean? I mean, it seems to me it's just that they said, the testimony of Lofquist basically said it was disruptive behavior and it was the interference emails to faculty members and the creating of that. She did recite the incidences, but it's much broader than that. She had a whole notion of disruption. And the question is, why do we have to say it's egregious? It seemed to be disruptive enough where they concluded you couldn't have a collegial faculty. The case law in this circuit, especially with Jones and different cases where they have found that disability-related conduct could be terminable, resulted when, for example, in the Jones case, he made a direct threat that he was going to murder his supervisor. They then placed him on a probationary period and found that he was injurious to himself and others and found that he was a direct threat to the workplace safety, and that was justifiable termination in that case. So that's why I thought your position might be that you can't do what they did here without some sort of accommodation first. Correct, Your Honor. That's not your position, I gather. You're just saying flat up that this had to be more egregious conduct. Yes, Your Honor. And where do you get the standard for egregiousness? I mean, Halperin, we talked about just professionalism. Yes, Your Honor. And he just sort of flunked the professionalism. He was a pretty good student. So here we're talking about faculty collegiality, the ability to work together, to work in committees, to carry out the mission of the university, and you have a bunch of teachers, not one, not two, a bunch of them, expressing enormous problems about his disruptive behavior. It's not the fact that he attempted suicide. It's the fact that he involved faculty and spread e-mails about it, and then they were wondering whether it's real or not, whether it's postured. Yes, Your Honor. And since I'm out of time, I would like to, so we don't lose rebuttal time, point out, though, that Davis also did present a number of faculty members who said that he was collegial and that they loved working with him, and so there's both sides of that case, too. But that does not neutralize the disruption he caused to others. In other words, the fact if you have 100 faculty members and you have 25 very good friends, but you have antagonized 75% of the faculty, the 25 good friends doesn't get rid of the problem. Yes, Your Honor. But let me ask you just a totally unrelated question, and maybe you don't know the answer. Later in the process, he started sending some poetic statements, Fury, I have to know, and one, he says, you have a hint, citrus cometh. I couldn't get the hint. I don't know what that hint is either, Your Honor.  Thank you. Thank you. All right. We'll hear from Ms. Jordan. Ms. Jordan, I thought that the contention that was being made, maybe I misread the briefs and it wasn't really presented this morning, was that there were three bases for getting tenure and that he met all three of them and that this business about collegiality was never in anything written. And, in fact, he offered substantial evidence that he was collegial. Indeed, rather than the 100 people, if there were 100 people and 10 were saying he was collegial and 90 were saying he wasn't, we had just the reverse. He had offered many more evidences of collegiality than the university offered that he wasn't, perhaps because people were afraid to testify. I mean, that was the submission. So what do you have to say about that? Your Honor, the issue of collegiality and the way that it's framed in the faculty handbook, it states that in determining whether or not a professor shall be granted tenure or shall have his contract renewed, the university looks at three factors, professional competence, potential future contributions, and institutional needs and resources. He didn't fail any of those, right? Your Honor, the district court probably found that he was unqualified for this position or that he failed to meet the legitimate standards or legitimate expectations of the university because he is unable to or he failed to forecast any evidence to show for his potential future contributions or institutional needs and resources of the university because he was unable to work with other colleagues because of his egregious, undisputed... Is that what the university said when it fired him or didn't allow him to have tenure? Your Honor, the university stated from the very beginning that he was being denied tenure because of his pattern of disruptive behavior. Right. It doesn't seem to be any one of those three things. Your Honor, they... I mean, I'm not sure it has to be, but it just doesn't seem to be. And I thought that that was all, but, I mean, the university, the board, the faculty board, I think that's why they went with him because they thought that, okay, he passes these three things. It seems to me that that's really an unrealistic point of view. You don't want somebody that is impossible to get away from this case, impossible to get along with, but is a great teacher, contributes to the community, has a lot of scholarship. But that isn't said in, as I understand it, with among these three things, and that's what I wanted you to talk to me about. Thank you, Your Honor. They're all synonymous as far as being able to present evidence for satisfying the institutional needs here and the future contributions also go towards his collegiality, which has been recognized by this court in Mayberry as being a factor. But it's not recognized by this university. It didn't say anything about collegiality, did it, in the written materials about what you need to get tenure? In the written materials, it's not specifically stated. However, there was testimony from his dean and his chair, Dr. Garcia-Castagnon, that collegiality was a factor to be considered. But we're not discussing collegiality here. This has to do with misconduct and his pattern of disruptive behavior, which the university cited from the initial beginning with the chair's recommendation, the department's recommendation, the college's recommendation, the dean's recommendation, the university's recommendation, the provost and the chancellor's recommendation. But not the faculty's recommendation. The Faculty Hearing Committee didn't know the reasons why he was denied tenure. Right, I understand that. None of the persons except for Dr. Garcia-Castagnon and Dr. Szabo were any of the decision makers and were on any of the panels that made the decision to deny him tenure. Those were other persons. The persons at the Faculty Hearing Committee were primarily witnesses that were called on behalf of Dr. Davis, the plaintiff, to ask questions at that time. And they did not find that he was impermissibly denied tenure based upon a disability discrimination. It was solely impermissible factors and one other factor that was not disability discrimination. And so they're apples and oranges, really, because the Faculty Hearing Committee did not know why. Why do you have a Faculty Hearing Committee, then, if you don't give them any information? I mean, just the whole thing is very weird to me. Your Honor, the purpose of the Faculty Hearing Committee would be to allow that plaintiff to put forth And he did. He put forth a really strong case. I can understand why they went the way they did. And the university didn't. Correct, Your Honor. The university determined there were insufficient facts and evidence to support the Faculty Hearing Committee's decision and held that they would like to upfirm the decision of the various committees that reviewed his The university didn't put forth any kind of case in front of this faculty committee, did it? I mean, you go read that record and it's Your Honor, I don't believe that they would need to. And in this case Well, then why do you, as I say, what is the purpose of this faculty committee? Your Honor, it would be part of the appellate process or a venue for appeals. I mean, in the normal procedure, if we had, for example, if this was within a corporation and they had some sort of group that you would go to, then we'd look at what the evidence the corporation put in to justify its decision. And we would find it really lacking here and that the employee had made a really good case. Your Honor, the plaintiff in this case was able to call any of the decision makers, I'm sure, to ask them about the basis for their decision at the faculty hearing committee. And he failed to do so. And so he didn't present his evidence or he didn't present any evidence on the basis of or to support why the various committees that reviewed his tenure application made the decision that they did. And he had the opportunity to do that and he did not do that. Here, the university properly determined and the district court properly determined that plaintiff failed to forecast evidence to support that prima facie case of disability discrimination. They failed, the district court properly- He has a disability, right? Your Honor, we do not dispute that he had a disability at some point in time. The evidence shows- Okay, so he had a disability and there was adverse employment action taken against him. So he's met those two elements, right? Yes, Your Honor, we do not dispute those two. Okay, so now what didn't he make? Your Honor, the district court properly stated that the plaintiff failed to show that he was qualified or that he was- That's where we get into these three qualifications for tenure that are put out in the university's materials. Yes, Your Honor. And those also have to do- are not seen in exclusion of the case law that allows an employer to terminate an employee for misconduct. Those need to be looked at in conjunction with each other. I mean, if the faculty member murdered somebody, it doesn't fall into one of those three things, but I'm sure they'd deny him tenure, wouldn't they? Yes, Your Honor. And there is a provision for misconduct in the faculty hearing. But the problem was he didn't murder anybody. What happened here was that he exhibited conduct that somebody that was mentally ill would exhibit. So it's conduct flowing from his disability. And so was the university required to make some sort of accommodation, or is there at least a factual determination to be made about that? No, Your Honor, there's no factual determination to be made about that. And the university was never required to make an accommodation because he never requested one. After the fact he did, and that was accommodated. Yes, exactly, Your Honor. And here, it's not just the conduct that's stemming from his disability, which can be grounds for termination in and of itself based upon Halpern and Martinson and Jones. But in any event, there was multiple other instances of conduct that were, in fact, cited by decision-makers, including Dr. Cooper discussed other conduct, that there are individuals that altered their behavior around the plaintiff because they were scared of the plaintiff. And these are decision-makers that stated why they made the decisions that they did. Dr. Knotts talked about the plaintiff's intimidating conduct, his text messages, the parking space incident, other people being afraid. Dr. Szabo discussed her fear of physical safety. And all that, Dr. Szabo and Dr. Knotts, they were right there in the faculty saying whatever they said, which was, you know, that was one side, but it was pretty thin compared to all the evidence he put in. Correct, Your Honor. And the faculty hearing committee was heard by a non-lawyer. It was not a legal proceeding. It was plaintiff presenting evidence and the dean presenting evidence. It wasn't a court of law. This wasn't testimony here. It wasn't evidence that was submitted. Of course, we haven't had this in a court of law at all. And the other rest of these procedures were courts of law either, right? No, Your Honor, other than the district court finding that based upon the undisputed facts, there was no genuine issue of material fact here. There can't be any factual findings because it's summary judgment. That is correct, Your Honor. These were facts that were undisputed by either the plaintiff or the defendant as far as his pattern of disruptive behavior or his pattern of conduct here. He's not denying that he didn't commit any of these facts or any of this misconduct that was stated by the defendants. And I would like to also add, based upon the questions about collegiality and the plaintiff's affidavits, all of these were presented after the fact. They were presented after he was denied tenure. They were not part of the decision for tenure for the university. And what was presented afterwards? I'm sorry. I didn't understand what you said. I'm sorry, Your Honor. Any of the affidavits that were presented by the plaintiff on other people that were collegial, other people thinking that he was collegial. Well, he presented evidence to this faculty committee that he was collegial. He had come, you know, he came in and said, what do you think of me? His friends come in. I mean, I don't know that, did he know that he was being denied tenure because of collegiality? It was documented that he was being denied tenure based upon his pattern of disruptive behavior. To him before this faculty committee came? Yes, Your Honor. There was a letter. That's why he brought these people in to say he was collegial. So I assume that was after the fact. It wasn't collegial, Your Honor. The reason why he was denied tenure was not because of his collegiality. There was a letter that was written to him by the provost saying, based upon your pattern of disruptive behavior, we find that we will be denying you tenure. And so he was notified about that. And under the umbrella of the pattern of disruptive behavior are these other instances that were discussed or were taken into consideration by the individuals on the department committee, the college committee, the university committee, by the provost, by the chancellor when they made their decision. The district court probably held that the plaintiff failed to show that he was qualified and that he failed to show that he was meeting legitimate expectations of the job, and specifically because of the plaintiff's egregious, disruptive, and undisputed behavior. Here there are approximately 15 to 20 instances of conduct that were cited in the district court's opinion. They were also supported by documentation and affidavits of other individuals at Western Carolina that feared him, were scared of him, were intimidated by him because of his conduct there at the university. The university decision, the tenure decision here, makes this somewhat different than some of the other cases also, Martinson and Jones and Halpern, because with the university, they are allowing someone, in essence, permanent employment when they grant tenure. And this court has consistently held and federal courts have consistently held that they will give great deference to that university's decision, specifically and especially on academic issues and staffing issues. And I think it's important for this court to put forth that deference or accommodate that deference, especially if it's set forth under Halpern. The district court also probably held that the plaintiff failed to forecast evidence that he was discharged because of disability. There's no evidence that he was discharged because of that disability. Number one, because he was terminated because of his misconduct. And number two, plaintiff's own evidence established that neither of these suicide attempts were, in fact, genuine suicide attempts. In both of these purported suicide attempts, he stated that they were the result of unfortunate side effects of incompatible medications prescribed. Isn't that sort of inconsistent? It seems to me if they weren't genuine suicide attempts, then you can't blame the medicine because he's doing it, he's posturing. If he actually had suicide attempts, then he was blaming it on the medicine. But the medicine causes suicidal thoughts, right? Well, there's no evidence to support that, Your Honor, and there's no evidence. No, he claimed it. I mean, it's an inconsistent claim. At one point, he said, that conduct's attributable to my medicine. But the other time, basically, he said he really wasn't committing suicide and didn't have the suicidal attempt. So the question, he was posturing or seeking attention or whatever. Exactly. And that is his modus operandi at the university. He was creating this drama. He sends emails to people and gets them involved. Yes, Your Honor. And he's creating this drama around the university that is very disruptive to the university community, to the staff, faculty, and students there at the university, that could be harmful if he is taking pills in his office and driving through the campus, if he's possibly intoxicated or not intoxicated when other students are walking around campus there. It was the manifestations of his, if these were two purported suicide attempts, if they were suicide attempts, it's the manifestations and his behavior. And that the 2009 one, his testimony was inconsistent about whether or not he was actually intoxicated when he drove his car through campus when other students were there, arrived in Georgia. If we were to conclude, hypothetically, if we were to conclude that the university did not act on the basis that he had a disability, are we entitled to review anything else? No, Your Honor, because the district court. I mean, if they gave the reason that they didn't like the color of his sports car and said we're not going to give you tenure on that basis, we don't have a right to review that, do we? There would be no grounds to review that, Your Honor. This court doesn't sit as a. . . We'd have to maybe conclude, it would feed back on whether there was pretext. But if we were to conclude that the university acted on conduct and not on the disability, I mean, I don't think there's any direct evidence of acting on disability. This has to be a McDonnell indirect circumstantial evidence case, I think. And so then the question comes, if the conclusion is, whether it's right or wrong, the conclusion is the university had genuine issues that were not related to disability, we're not entitled to review those, are we? I mean, we have to defer to the university as to who they want around. I mean, it's basically at will at this point. Yes, absolutely. Absolutely, Your Honor, that is correct, and that would be what's set forth in Halpern and other cases that stated that courts give deference to the university's decisions in this matter. Under McDonnell. . . The only reason I'm asking this is there's some argument I thought I heard from Dr. Davis's side that the conduct has to be egregious. And it seems to me, even if it's not egregious and we don't think it's good enough to fire him, as long as we conclude he was not fired because of a disability, it seems to me any further inquiry is beyond judicial scope. That's correct, Your Honor, and there's no standard for egregious conduct here or that misconduct or any conduct. . . Well, I think that the argument was that the lack of the egregiousness shows that this was a pretext. That's what it goes to. That's what the argument is. Maybe it's not successful, but that is the argument, I think. But as to that argument, his conduct was egregious. Individuals were. . . Although that might be a question to be determined, so I would like to conclude that it was not egregious. I mean, it was egregious, but that he. . . There were instances of conduct that people were crying and emotional about, and there's no way to categorize that these. . . There's no requirement that this conduct be egregious. Neither Martinson requires that, nor Halpern. Jones is slightly different because it was. . . We have to evaluate whether the conduct was of a kind that we could conclude the university was genuine in a genuine reaction to it as opposed to a reaction to a disability. Yes, Your Honor. To avoid the pretext. . . To satisfy the pretext argument one way or the other. Exactly, Your Honor. And this would be satisfying. Again, it would be the plaintiff's burden to show that it was pretextual. I believe Jacobs was stated. . . In Jacobs, there was different documentation and different reasons entirely that was stated here. It was a consistent reason that it was. . . See, that's where their argument about these are the only three things that deprive you of getting tenure. It feeds into, well, this was a pretext because it wasn't one of these three reasons. That's why I was trying to tease out of you, but I was unsuccessful in doing so. Well, to answer that question then or to respond to that, it's not just those three reasons. It was, again, under the umbrella of the pattern of disruptive behavior that was cited in the AA12. I understand that that's what the university says now, but what it said when it was telling people what they needed to get tenure was these are the three criteria. And that's where it seems to me if there is a basis for the pretext argument, that's where it lies. I understand your argument, Your Honor. It's not my argument, it's my question. And it wasn't just those three. It has to be also collegiality, whether or not you can get along with your colleagues. Other circuits have adopted that as a consideration with tenure, and this circuit has adopted that as a consideration in Mayberry and some other cases in lower courts, that it would be a factor. And no point was the plaintiff. . . I think I understand your argument.  Thank you, Ms. Jordan. Thank you, Your Honor. Ms. Banfield. Your Honors, I have several points that I would like to make on rebuttal. First, that the attorney for Western just earlier admitted that collegiality wasn't considered in the decision to deny Davis tenure and promotion. And it was only first. . . That word itself was only first brought up in the district court's opinion. It's worse than collegiality. It's a pattern of disruptive behavior, which is more serious. Correct. And the pattern of disruptive behavior that they've. . . Whether we call it collegiality or disruptive behavior, it seems to me if you have disruptive behavior, it's going to be hard to be collegial. Correct. But the disruptive behavior that they used and that the district court relied on, that behavior wasn't ever revealed to Mr. Davis until 10 days before the discovery deadline. He wasn't aware that any of this disruptive conduct was what his tenure and promotion was based on, although he repeatedly asked for evidence of this conduct and what it was besides his three or two suicide attempts and the conduct in the fall of 2010. He repeatedly asked if there was anything other than those three instances on which his tenure and promotion was denied. And from the denial of his tenure through the FHC meeting, through the appeal to the Board of Governors, he was not given any information on any of those instances or patterns. What was he told? What was the first thing the university told him when he was brought under? The pattern of disruptive behavior that they cited, I believe it was. . . Didn't they use those words, pattern of disruptive behavior? They used the disruptive behavior. Dean Knotts told him that he based his decision on, in a meeting with Davis, on the disruptive effect of Davis's mental health conduct on those of his colleagues. But it was those instances, those three instances. Well, I understand, but those instances led to further things. In other words, the instances isolated isn't what they were focusing on. They were focusing on the reaction it was having on the faculty and on the community. Right, but. . . And so forth. And that was. . . It's hard to conceive of somebody being an employee in that community on a permanent basis where it has that kind of effect. That's what they were troubled by, I think. I do understand that, Your Honor. I mean, to isolate it and say, oh, he only had three events, or he only had two events, or he had six. And the council says the district court referred to over 20 events in the record. And so I don't know if that makes a lot of difference. The question, I suspect, is whether the university was trying to get rid of him because of his mental health defect, or they were trying to get rid of him because of his conduct. Now, if they were trying to get rid of him because of his conduct, I'm not sure we can review that, can we? If we conclude that they were not reacting to his mental health. If that's your conclusion, it would be different than if it was just those three instances. But the dean, the provost, and the chancellor who admitted that he just regularly accepted the recommendation of the provost, those three decision makers repeatedly throughout the record have stated that they used only those three instances to base their denial, their recommendation for denial of tenure and promotion. Where does that get you? That is just proves that there's a genuine dispute of material facts. And there were genuine reasons. That's the problem. In other words, your burden is to show ultimately, even under the circumstantial evidence, is that there was discrimination against him based on his mental disability, not that they were unjust. Right. And so for you, even through the pretext, you have to be able to show, even if it is pretext, that the real reason was that they got rid of him because of his mental health. Correct. And just as sort of a policy standpoint, it would be difficult to separate the conduct that stems from a mental health disability from the mental health disability itself in saying that the behavior had a negative effect, but that behavior can't necessarily be wholly tied back to the mental health disability. If that conduct is separated from the mental health disability, then it doesn't afford the same protections as to say someone with a physical disability. If you separate this conduct from the mental health disability. When do you suggest that the university had noticed that he had a mental health problem? They had noticed or perceived him as having a mental health problem the day after or the day of that emergency response team meeting, that first one after his first suicide attempt in October of 2009. They sent him a list of mental health specialists to, they sent him a list of mental health specialists to go and receive care from. And so they, at that point perceived him as having a mental health disability and perceived that the suicide attempts were related to his mental health disability. I've run out of time, your honors, but I would like to just make a note that we respectfully request that you reverse the summary judgment of the district court in favor of Western and remand this case for a jury trial. Thank you, your honors. Thank you. All right. I'd like to recognize the good service of the Wake Forest program. I can remember some years back, a Wake Forest presented a case, I think it was in a habeas case and I wrote the opinion and granted the habeas writ and it made the newspapers nationally. And I'm sure the student was just as proud as buttons. It was successful. And I think over the years, your program has done an excellent job and congratulations. I hope we see you more after you get, you don't have your degrees yet. Do you? Well, I hope they give it to you. All right. We'll come down and adjourn court sine die and come down and greet council. This honorable court stands adjourned sine die. God save the United States and this honorable court.
judges: Paul V. Niemeyer, Diana Gribbon Motz, Stephanie D. Thacker